## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA DAUGHERTY, | : | Civil No. 4:24-CV-811 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social Security | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.     Introduction

The plaintiff, Lisa Daugherty, appeals from a decision of an Administrative Law Judge (ALJ) denying her application for disability benefits. According to Daugherty she has been totally disabled since June of 2020 when she alleges that she suffered a series of "mini strokes" which compounded her other pre-existing physical and emotional impairments. Yet, this claim of complete disability beginning in June of 2020 was contradicted by Daugherty's own reports of her

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

activities of daily living following the alleged onset of her disability. These reports included statements in July of 2021 by Daugherty that she "has been working out with aerobic exercise, weight training", (Tr. 568), and Daugherty's September 2021 report that "3 weeks ago she was completing her morning exercises like usually [sic] and then went to go shoot pool for a few hours." (Tr. 720, 727).

Moreover, with respect to Daugherty's claim that she suffered multiple "mini strokes" in June of 2020, her description of these events conflicts with contemporaneous treatment notes and imaging test results. These clinical test results led physicians to doubt that she had experienced any strokes. Further, these records indicated that Daugherty declined medical testing in June of 2020 to determine whether she had suffered a stroke. (Tr. 373-415, 458-486).

Presented with this equivocal clinical evidence, Daugherty's own inconsistent statements, and an array of medical opinions, many of which found that she retained the ability to perform some work, the ALJ ultimately concluded that Daugherty had not met the exacting standards prescribed for disability under the Social Security Act and denied her claim. While Daugherty now challenges this decision on several grounds, she faces an exacting burden of proof and persuasion in this appeal since our analysis of this case cabined by the "substantial evidence" standard of review in Social Security cases, which is limited by the Supreme Court's mandate that:

2

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Under this standard of review, we are obliged to affirm the decision of the administrative law judge (ALJ) once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)).

Mindful of these legal mandates, after a review of the record, and acknowledging that in this setting substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'"

<u>Biestek</u>, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    <u>Statement of Facts and of the Case</u>

### A. <u>Background</u>

On August 19, 2021, Lisa Daugherty applied for benefits under Title II of the Social Security Act, alleging an onset of disability beginning June 9, 2020. (Tr. 11). According to Daugherty, the triggering event which led to her total disability occurred "when I suffered two mini-strokes in less than a week in June of 2020," after which her "health took a steady decline." (Tr. 59-60). Thus, Daugherty insisted that this rapid succession of mini-strokes in June of 2020 exacerbated a series of other medical conditions, including lumbar degenerative disc disease, cervical spondylosis, migraine headaches, gastroesophageal reflux disease (GERD), depression, generalized anxiety disorder, post-traumatic stress disorder (PTSD), and substance abuse disorder—marijuana, and left her unable to work. (Tr. 13).

Daugherty's date last insured was September 30, 2022. (Tr. 13). Therefore, the issue before the ALJ was whether Daugherty's impairments were so severe during this roughly two year time frame between June 2020 and September 2022 that she was unable to work. Daughtery was born in April 1970 and was 50 years

4

old at the time of this alleged onset of her disability. (Tr. 24). She had a high school education but had only a sporadic, episodic work history. (Id.) Prior to the alleged onset of her disability in June of 2020 Daugherty reported an active lifestyle that involved housework, hiking, aerobic exercise, weight training, and shooting pool. (Tr. 45, 60). There were also indications in the clinical record that Daugherty was employed after the date of her alleged onset of disability.[2]

### B. **The Lack of Clinical Support for Daughtery's Claim that She Experienced Strokes in June 2020.**

As framed by Daugherty the factual lynchpin for her disability claim was her allegation that "I suffered two mini-strokes in less than a week in June of 2020," after which her "health took a steady decline." (Tr. 59-60). However, these allegations that Daugherty suffered multiple strokes in June 2020, drew scant support from the clinical record.

To be sure, Daugherty was treated at the York Hospital Emergency Department on June 3, 2020, when she reported suffering from weakness and

---

[2] See Tr. 815, a March 15, 2022 medical entry indicating that Daugherty was seeking a "note for her job stating that she is safe to drive while being on medication." This request for a note for her employer was made some twenty-one months after the date that the plaintiff alleged that her impairments were so severe that they precluded any employment. Daugherty was questioned regarding this apparent inconsistency at the ALJ hearing but simply denied working in any capacity after June of 2020. (Tr. 60).

sensory deficits. (Tr. 373). However, an initial NIH stroke scale assessment found few signs of stroke symptoms and rated her stroke risk at 4, a level which was emblematic of only mild and minor symptoms. (Tr. 374). MRI and CT examinations conducted at that time were also largely unremarkable. (Tr. 376-77). Given these benign clinical findings one treating physician, Dr. Scott Williams, stated that he "Doubt[ed] CVA[cardiovascular accident, i.e. a stroke]" in her case. (Tr. 377). These diagnoses were echoed by Dr. Christopher Fanale who provided the following: "Assessment Impression: Complex Migraine, less likely stroke given variable, possible volitional exam findings." (Tr. 404). As this clinical encounter drew to a close Daugherty's caregivers reported that they: "Still ha[d] low suspicion for CVA/TIA." (Tr. 406). Daughtery was aware of this diagnosis since medical staff "did inform her that her MRIs did not reveal any acute findings and no evidence of CVA at this time." (Tr. 413).

Nonetheless, six days later, on June 9, 2020, Daugherty again reported to the emergency room complaining of similar symptoms. (Tr. 458-86). On this occasion—which corresponded with the date of the alleged onset of her disability— the clinical evidence was largely unremarkable.  Test results were benign, (Tr. 458, 461, 470); Daugherty declined to undergo further testing, (Tr. 458); and an NIH stroke scale assessment rated her stroke risk at 0. (Tr. 474-75). Given the lack of

clinical evidence supporting a stroke diagnosis, it was determined that "[h]er symptoms are likely related to increased stress and anxiety," (Tr. 458) and it was "[l]ess likely to be a CVA given her non specific complaints." (T. 476).

### C. **Daugherty's Activities of Daily Living.**

Daugherty's self-reported activities of daily living also cast doubt upon her claim of complete disability. While Daugherty described an extreme degree of physical impairment at the ALJ hearing, stating that she was barely able to stand or walk and was unable to perform many household functions, (Tr. 61-65), at other times during the pertinent time period she reported enjoying a much more active lifestyle. For example, in a December 2021 adult function report, Daugherty acknowledged an ability to cook, do some laundry, shop, drive, walk several blocks, and lift ten to fifteen pounds. (Tr. 261-66).

On other occasions Daugherty described a very active and full lifestyle. For example, on March 12, 2021 Daugherty told her family physician that she was: "Exercising more; upwards of 5 days/week for 1-2 hours per session." (Tr. 602). In July of 2021 Daugherty stated that she "has been working out with aerobic exercise, weight training", (Tr. 568), and in September 2021 Daugherty reported that "3 weeks ago she was completing her morning exercises like usually [sic] and then went to go shoot pool for a few hours." (Tr. 720, 727).  According to Daugherty she only

experienced pain when she was shooting pool for an extended period of time. (Tr. 722).

Further, these clinical records actually indicated that Daugherty was working during the period when she claimed that her pain precluded any gainful activity. For example, a March 15, 2022 medical entry indicated that Daugherty was seeking a "note for her job stating that she is safe to drive while being on medication." (Tr. 815).

### D. **Daugherty's Longitudinal Treatment History**

Likewise, Daugherty's longitudinal treatment history provided scant support for a claim of complete disability between June 2020 and September 2022. With the exception of a single isolated instance of severe reported depression marked by some suicidal ideation following a night of drinking and karaoke, (Tr. 853), these treatment notes were replete with benign and unremarkable mental and physical findings. (Tr. 522, 531-34, 542, 543, 555, 571, 602, 605, 620, 628, 634, 635, 795, 828-30, 837, 902). Moreover, imaging tests, x-rays, EKG examinations and other testing revealed only mild degenerative disc disease and otherwise reflected normal findings. (Id.)

8

### E.  **Medical Opinion Evidence**

Notably, despite her extensive treatment history, no treating source opined that Daugherty suffered from any form of disability.[3] Instead, the ALJ was left to consider an array of state agency expert and one-time consulting source opinions. These medical sources reached somewhat differing conclusions regarding the degree of impairment experienced by Daughtery, but there was a broad consensus among most of the medical sources that Daugherty retained the ability to perform some work.

For example, with respect to Daugherty's physical impairments, in March and October of 2022, two state agency experts, Dr. Charles Hubbard and Dr. Glenda Ann Cardillo, concluded that Daugherty was physically capable of performing light work. (Tr. 75-82, 106-08). Further, given the lack of any clinical evidence supporting her claims that she had suffered "mini strokes", both agency experts found that this condition was not a medically determinable impairment. (Tr. 82, 108).

Daugherty also underwent one-time physical examinations in February and September of 2022, with Dr. James Goodyear and Dr. Ahmed Kneifati. (Tr. 759-

---

[3] The lack of treating source opinion evidence may be, in part, a function of the fact that her treatment records reveal that Daugherty was a difficult patient who was once briefly dismissed from her family practice due to her verbally abusive and disparaging conduct. (Tr. 610).

770, 920-30). These examining sources agreed that Daugherty could meet the exertional demands of light work, but, relying largely upon her self-reported limitations, found that she was somewhat more limited in terms of standing and walking. (Id.) Neither of these examining physicians reconciled this aspect of their opinions with Daugherty's self-reported workout, exercise, and sporting activities.

Similarly, with respect to Daugherty's emotional limitations, there was a diversity of medical opinions, but significant opinion evidence supported the view that Daugherty's mental conditions imposed no more than a moderate degree of impairment upon the plaintiff. Thus, in March and October of 2022, two state agency experts—Dr. Thomas Fink and Dr. John Gavazzi—found that Daugherty suffered from only mild to moderate impairments in meeting the mental demands of the workplace and agreed that she could perform simple tasks. (Tr. 74-80, 103-08). One examining source, Dr. Kathleen Ledermann, reached an even more benign opinion in September of 2022, concluding that Daugherty suffered from no more than mild mental impairments. (Tr. 939-47). The only outlier opinion suggesting a greater degree of emotional impairment for Daugherty was provided in February of 2022 by Dr. John Kajic. (Tr. 779-85). Relying in part upon Daugherty's unsupported claim that she had experienced "too many strokes" to work, (Tr. 779), Dr. Kajic concluded

that she suffered from a marked impairment in her ability to work with others. (Tr. 785).

It was against this medical background that Daugherty's case came to be considered by the ALJ.

### F. **The ALJ Hearing and Decision**

A hearing was conducted in this case on April 18, 2023, at which Daugherty and a vocational expert testified. (Tr. 55-72). Following this hearing, on May 11, 2023, the ALJ issued a decision in Daugherty's case. (Tr. 8-25). In that decision, the ALJ first concluded that Daugherty met the insured requirements of the Act through September 30, 2022, and had not engaged in substantial gainful activity since the alleged onset date of June 9, 2020. (Tr. 13). Having identified the pertinent time frame for this disability claim, at Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Daugherty had the following severe impairments: lumbar degenerative disc disease with radiculopathy, lumbar facet arthropathy, cervical spondylosis, migraine headaches, gastroesophageal reflux disease (GERD), depression, generalized anxiety disorder, post-traumatic stress disorder (PTSD), and substance abuse disorder—marijuana. (Tr. 13).

The ALJ considered Daugherty's claim that she had suffered severely disabling mini strokes but noted the paucity of proof supporting that claim, stating:

11

The claimant testified to the residual effects of two "mini strokes" from June 2020 that caused facial and extremity paresthesia. However, no such diagnosis appears in the medical record from an accepted medical source. While the claimant visited the emergency department for facial numbness and left upper extremity weakness, the neurologic work up was unremarkable. MRI studies were unremarkable, and the head CT perfusion studies were negative as well. Lab work was normal. She declined further workup for TIA stroke. While neurology was consulted for possible TIAs (Exhibit 4F), the providers doubted CVA and determined that her symptoms were likely related to increased stress and anxiety and radiographic studies and laboratory testing was negative and physical examination findings regarding sensation, reflexes, gait, and speech were normal (Exhibits 1F, 3F/1, and 4F). Social Security Ruling 96-4p states, "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." Therefore, in the absence of laboratory or clinical findings or medical observations validating symptoms the existence of a physical impairment cannot be medically determined. However, the undersigned notes that the alleged physical symptoms for anxiety have been considered with anxiety. Further, even if the claimant had a medically determinable impairment regarding stroke, she would not require a more restrictive residual functional capacity than the undersigned has provided.

(Tr. 14).

At Step 3, the ALJ determined that Daugherty did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 13-17). Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Daugherty's impairments as reflected in the medical record, and found that:

12

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawl but never climbing ladders, ropes, or scaffolds. She must avoid exposure to extreme cold and hazards, such as heights and machinery. She can understand and carry out simple, routine, repetitive tasks. She can sustain attention for two-hour segments while maintaining regular attendance and being punctual within customary limits in a work environment free from fast paced production and involving only simple work-related decisions with few, if any, workplace changes and occasional supervision.

(Tr. 17).

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Daugherty's self-described limitations. (Tr. 17-24). The ALJ first engaged in a two-step process to evaluate her alleged symptoms, finding that, although the plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. In particular, the ALJ observed that:

> The undersigned has considered the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms in accordance with SSR 16-3p and has found the statements are not consistent with the record. In addition to the objective medical evidence not supporting the claimant's allegations of debilitating symptoms as noted above, the claimant has provided inconsistent information

13

regarding daily activities in that she has described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations. Specifically, the claimant provides for personal care, prepares simple meals, and performs light household chores, and she cares for the family dog while her spouse works outside the home for sixty plus hours per week. For entertainment, she watches television, reads, listens to the radio, and plays games on her cellphone. When physically able, she exercises and shops in stores. She drives a vehicle, and she drove herself to the September 2022 consultative mental status examination (Exhibits 3E, 4E, 5E, 11F, 12F, 18F, and 19F; Testimony). These admitted abilities provide support, in part, for the residual functional capacity set forth above and are quite inconsistent with the claimant's allegations of totally debilitating impairments.

(T. 21).

The ALJ also considered the medical opinion evidence, and found the state agency expert consensus that Daugherty could perform simple tasks at a light exertional level to be persuasive, noting that these opinions were supported by, and consistent with, the clinical record. (Tr. 22-23). The ALJ found the opinions of Dr. Goodyear and Dr. Kneifati less persuasive in terms of their proposed limitations on standing and walking, observing that these "opinions were based on a one-time examination and appears to overestimate the claimant's reporting of limitations and daily difficulties as the claimant provides for personal care, performs some light household chores, shops in stores, drives a vehicle, and prepares simple meals." (Tr. 22). Likewise, with respect to Daugherty's mental impairments, the ALJ  found Dr.

14

Ledermann's opinion that Daugherty suffered from only a mild degree of impairment unpersuasive in that it understated the severity of her condition. (Tr. 23). The ALJ also concluded that Dr. Kajic's opinion that Daugherty experienced some marked impairments was unpersuasive, noting that this opinion was "based on Dr. Kajic's observations of immature behavior during the consultative examination, which was not consistent with observations of providers in the longitudinal record." (Id.)

Having made these findings, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Daugherty could perform. (Tr. 24-25). Accordingly, the ALJ concluded that Daugherty had not met the stringent standard of disability set by law and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Daugherty argues that the ALJ erred in assessing the medical opinion evidence and improperly failed to consider her alleged mini strokes as a severe impairment. However, finding that substantial evidence supported the ALJ's decision in this case, for the reasons set forth below, we will affirm the decision of the Commissioner.

15

III.    **Discussion**

A. **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review, "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather, our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id.</u> at 120; <u>see</u> <u>Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based in part upon alleged inadequacies in the articulation of a claimant's mental RFC. In <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In <u>Hess</u> the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which

would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

## B. **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant

21

is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)

(quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such

as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the

Commissioner's regulations governing medical opinions changed in a number of

fundamental ways. The range of opinions that ALJs were enjoined to consider were

broadened substantially, and the approach to evaluating opinions was changed from

a hierarchical form of review to a more holistic analysis. As one court as aptly

observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." <u>Revisions to Rules
> Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u>
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the
> foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg.
> 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered
> the supportability and consistency factors" for a medical opinion. 20

C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

Judicial review of this aspect of ALJ decision-making is still guided by several

settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." Chandler

v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence

for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d

Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater

persuasive force.

> Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without
> crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
> Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); Connors v.
> Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

### D. **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our

independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but

more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Daugherty retained the residual functional capacity to perform a range of light work with simple tasks. Therefore, we will affirm this decision.

At the outset, we find that substantial evidence supported the ALJ's decision that Daugherty's alleged mini strokes were not a medically determinable impairment. On this score, the ALJ's analysis is judged against familiar benchmarks. As we have observed:

> At step two of the sequential evaluation process, the ALJ considers whether a claimant's impairments are (1) medically determinable or non-medically determinable, and (2) severe or non-severe. <u>See</u> 20 C.F.R. § 416.920(a)(4)(ii)("If you do not have a severe medically determinable physical or mental impairment ... we will find that you are not disabled."); SSR 96–4p, 1996 WL 374187 at *1 (S.S.A.1996)("In the absence of a showing that there is a medically determinable physical or mental impairment, an individual must be found not disabled at step 2 of the sequential evaluation process."). To be medically determinable, an impairment must "result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." SSR 96–4p, 1996 WL 374187 at *1. "Under no circumstances may the existence of an impairment be established on the basis of symptoms alone." <u>Id.</u> at 2.

Moon v. Colvin, No. 1:15-CV-00362, 2015 WL 7769418, at *7 (M.D. Pa. Nov. 9, 2015), report and recommendation adopted, No. 1:15-CV-362, 2015 WL 7755664 (M.D. Pa. Dec. 2, 2015).

In this case, the ALJ found Daugherty's claim that she suffered from repeated stokes was not medically determinable and substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Biestek, 139 S. Ct. at 1154, supported this conclusion. In fact, the medical record is replete with evidence which contradicts Daugherty's claims that she suffered strokes in June of 2020. This assertion is at odds with the clinical observations of her caregivers, is unsupported by objective testing conducted in her case, and flies in the face of every contemporaneous medical opinion she received in June of 2020. Moreover, it appears that Daughtery was well aware of these medical findings since medical staff "did inform her that her MRIs did not reveal any acute findings and no evidence of CVA at this time." (Tr. 413). Given this constellation of evidence, the ALJ was fully justified in concluding that Daugherty had not met her burden of showing that these alleged "mini strokes" were medically determinable impairments. There was no error here.

The ALJ's evaluation of the medical opinion evidence also comported with the dictates of law and was supported by substantial evidence. At the outset, the ALJ

was entitled to rely upon the state agency expert consensus that Daugherty could

perform simple tasks at a light exertional level. Indeed, it is well-settled that:

> State agency doctors are also entitled to have their opinions given
> careful consideration. As the court of appeals has observed:
>
>> "[t]he law is clear ... that the opinion of a treating physician does
>> not bind the ALJ on the issue of functional capacity," Brown v.
>> Astrue, 649 F.3d 193, 197 n. 2 (3d Cir. 2011). State agent
>> opinions merit significant consideration as well. See SSR 96-6p
>> ("Because State agency medical and psychological consultants
>> ... are experts in the Social Security disability programs ... 20
>> C.F.R. §§ 404.1527(f) and 416.927(f) require [ALJs] ... to
>> consider their findings of fact about the nature and severity of
>> an individual's impairment(s)....").

Deiter v. Berryhill, No. 3:16-CV-2146, 2018 WL 1322067, at *6 (M.D. Pa. Feb. 5,

2018), report and recommendation adopted, No. 3:16-CV-2146, 2018 WL 1315655

(M.D. Pa. Mar. 14, 2018) (quoting  Chandler v. Comm'r of Soc. Sec., 667 F.3d 356,

361 (3d Cir. 2011)).

Such reliance was fully justified in this case, particularly in the absence of any

countervailing treating source medical opinions. Moreover, the ALJ correctly

concluded that these state agency expert opinions bore the indicia of persuasiveness

in that they were consistent with, and supported by, the clinical evidence and

Daugherty's reported activities of daily living.  That clinical record disclosed that

Daugherty's physical and mental examinations frequently yielded unremarkable

findings. Further, imaging, x-rays, and other tests disclosed no more than mild degenerative disc disease. In addition, the ALJ aptly noted that the degree of disability claimed by Daugherty was inconsistent with her self-reported activities, which included exercise, employment, and shooting pool. Further, substantial evidence supported the ALJ's decision to give greater persuasive force to this agency expert consensus than the one-time examining source opinions which reached results which were in some respects inconsistent with one another and not entirely congruent with Daugherty's treatment history and self-described activities.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting de novo might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Therefore, under the deferential standard of review that applies to appeals of Social Security disability

determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.    <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: November 19, 2025

33